

FILED & ENTERED

JUL 07 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA- LOS ANGELES DIVISION**

| | |
|---|---|
| In re: | Case No. 2:18-bk-18159-RK |
| MARTHA ALICIA FERNANDEZ, | Chapter 7 |
| Debtor. | Adv. No. 2:18-ap-01327-RK |
| YVETTE WALDEN, GUADALUPE L. CRUZ and JOSE L. CRUZ, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' COMPLAINT UNDER 11 U.S.C. § 523(a)(2)(A)** |
| Plaintiffs, | |
| vs. | |
| MARTHA ALICIA FERNANDEZ, | |
| Defendant. | |

This adversary proceeding was tried before the court on September 17, 18 and 24 and November 13, 2020 on the complaint of Plaintiffs Yvette Walden, Guadalupe L. Cruz and Jose L. Cruz based on a claim under 11 U.S.C. § 523(a)(2)(A).  M. Jonathan Hayes, Pardis Akhavan and Kasra Torabi of the law firm of Resnik Hayes Moradi LLP appeared for Plaintiffs.  Gary S. Saunders and Jenny Shin of the Saunders Law Group appeared for Defendant Martha Alicia Fernandez.

Having received the testimony and evidence offered and admitted at trial and considered the written and oral arguments of the parties, the court sets forth its findings

of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052, as follows: [1]

## FINDINGS OF FACT

1.      Plaintiffs Yvette Walden ("Ms. Walden"), Guadalupe L. Cruz ("Mrs. Cruz") and Jose L. Cruz (collectively, "Plaintiffs"), own as joint tenants the real property located at 654-658 19th Street in San Pedro, California ("Property"), which was the home of Guadalupe L. Cruz and Jose L. Cruz.  Admitted Fact No. 1, Amended Joint Pretrial Stipulation, Docket No. 34, filed on December 2, 2019; Trial Declaration of Guadalupe L. Cruz ("Cruz Trial Declaration"), ¶¶ 3-5; Trial Declaration of Yvette Walden ("Walden Trial Declaration"), ¶¶ 3-4.

2.      Plaintiffs purchased the Property on December 31, 2002 for about $305,000.  Admitted Fact No. 2, Amended Joint Pretrial Stipulation; Cruz Trial Declaration, ¶ 4; Walden Trial Declaration, ¶¶ 3-4.  The Property consisted of two small houses on a small but long lot.  Cruz Trial Declaration, ¶ 5; Walden Trial Declaration, ¶¶ 3-4.

3.      Defendant Martha Alicia Fernandez ("Ms. Fernandez" or "Defendant") owned and operated a construction business called First Choice Remodeling during the years at issue in this adversary proceeding, 2015 through 2017.  Trial Declaration of Martha Alicia Fernandez ("Fernandez Trial Declaration"), ¶ 3. [2]

4.      Ms. Walden is a daughter of Guadalupe Cruz and Jose Cruz.  Admitted

---

[1]  These findings of fact and conclusions of law are partially based on the proposed findings of fact and conclusions of law submitted by the parties, which have been independently reviewed and revised by the court based on its review of the evidentiary record at trial.  As ordered by the court, plaintiffs lodged their proposed findings of fact and conclusions of law on December 21, 2020, and defendant lodged her proposed findings of fact and conclusions of law on February 12, 2021.  The matter was taken under submission after the deadline of February 26, 2021 for plaintiffs to file objections to defendant's proposed findings of fact and conclusions of law had passed.  No such objections were filed.

[2]  The references are to the original trial declaration of Defendant Martha Alicia Fernandez, Docket No. 39, filed on February 27, 2020, which was received into evidence.  Defendant filed an amended trial declaration, Docket No. 57, on September 3, 2020, but it was stricken from the record by the order granting Plaintiffs' motion to strike it as late filed, Docket No. 60, filed and entered on September 11, 2020.

Fact No. 3, Amended Joint Pretrial Stipulation; Walden Trial Declaration, ¶¶ 2-3. According to Ms. Walden, her parents decided to purchase the Property in 2002, and she is on title because she had good credit and was able to obtain a loan that helped her parents finance the purchase.  Walden Trial Declaration, ¶ 4.  Ms. Walden lived on the Property for two years and moved out when she got married.  Walden Trial Declaration, ¶ 4.

5.      Plaintiffs Guadalupe and Jose Cruz lived in the front house on the Property with some of their adult children from 2002 to a year or so before construction started, and they had moved into an apartment.  Cruz Trial Declaration, ¶ 5.  As of February 12, 2020, the date of her trial declaration, Guadalupe Cruz and her husband, Jose Cruz, were retired, and before retirement, she was a teacher's assistant for the Los Angeles Unified School District for 15 years, and he was a factory worker.  Neither of them had any involvement in a remodeling project before or since the subject project.  Cruz Trial Declaration, ¶ 3.

6.      Debbie Cruz is another daughter of Guadalupe Cruz and Jose Cruz, and she and her husband lived in the front house on the Property prior to the beginning of the construction project at issue in this case, and Ms. Cruz, not a title owner of the Property, participated in the discussions between her mother and sister and Ms. Fernandez about the construction project.  Cruz Trial Declaration, ¶ 22; Trial Declaration of Debbie Cruz ("Debbie Cruz Trial Declaration"), ¶¶ 3-4; Trial Testimony of Debbie Cruz, September 17, 2020; Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 16 from Amended Joint Pretrial Stipulation.

7.      Plaintiffs decided to remodel the Property, by tearing down the back house, expanding the first floor in the front house, and adding the second floor to the front house so that they would have more room ("remodeling").  Plaintiffs obtained plans for this remodeling through an engineer/architect named Wole Adefesco ("Wole Plans"), prior to meeting Defendant Martha Alicia Fernandez.  Stipulation of November 13, 2020 re:

Disputed Issue of Fact No. 13 from Amended Joint Pretrial Stipulation; Cruz Trial Declaration, ¶¶ 6-7; Walden Trial Declaration, ¶ 5; Trial Declaration of Debbie Maria Cruz ("Debbie Cruz Trial Declaration"), ¶¶ 5-7; Fernandez Trial Declaration, ¶¶ 3, 4, 6.

8.    In early November 2015, Debbie Cruz met Defendant's daughter through work.  In a casual conversation, Defendant's daughter told Ms. Cruz about her mother, Ms. Fernandez, mentioning that Defendant was a contractor and operated her own business, and Ms. Cruz told Defendant's daughter that her mother, Mrs. Cruz, was actually in the process of remodeling.  Ms. Cruz never asked Defendant's daughter to have her mother give a call, but days later, Ms. Cruz received a call from Defendant asking her to call back.  When Ms. Cruz did not return Defendant's call, Defendant called her again, and Ms. Cruz took the call.  During the call, Defendant told Ms. Cruz that she was interested in meeting with her to discuss Plaintiffs' remodeling project, and Defendant further told Ms. Cruz that she [Defendant] has been a licensed contractor for many years and that she owns her construction business called "First Choice Remodeling."  Debbie Cruz Trial Declaration, ¶¶ 8-10; Trial Testimony of Debbie Cruz, September 17, 2020.

9.    Afterwards, Defendant called Debbie Cruz again and invited Ms. Cruz to meet her at a job site in Long Beach where Defendant was adding a master bedroom for a customer.  In mid-November 2015, Mrs. Cruz and Debbie Cruz agreed to meet with Defendant at her job site, and Debbie Cruz went to Defendant's job site along with Mrs. Cruz and Ms. Walden.  Debbie Cruz Trial Declaration, ¶¶ 11-13.

10.    In or around November 2015, Plaintiffs met with Defendant to discuss the remodeling project on their home consisting of a complete remodel of the home and addition of a second story to the Property.  Cruz Trial Declaration, ¶¶ 12-21; Walden Trial Declaration, ¶¶ 5-11; Fernandez Trial Declaration, ¶¶ 3, 4.

11.    The first meeting was at one of Defendant's "construction projects" in Long Beach, California.  Cruz Trial Declaration, ¶ 14; Walden Trial Declaration, ¶ 8; Debbie

Cruz Trial Declaration, ¶¶ 13-15; Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 5 from Amended Joint Pretrial Stipulation.  When Plaintiffs arrived at Defendant's job site, they saw three or four workers working for Defendant, and Defendant showed Plaintiffs around the site, telling them that she was building a master bedroom and bathroom in the back part of a friend's home and that she had invoiced the homeowner $70,000 for the job.  Debbie Cruz Trial Declaration, ¶ 14; Walden Trial Declaration, ¶ 8.

12.    According to Mrs. Cruz, at this first meeting, she told Defendant what Plaintiffs were looking for as far as the remodeling project, and she specifically asked Ms. Fernandez if she had a contractor's license, and Defendant definitely said yes to Mrs. Cruz.  Mrs. Cruz then told Defendant that Plaintiffs had $250,000 to spend on the project, and Defendant told Mrs. Cruz that she would call her later to get together to discuss it.  Cruz Trial Declaration, ¶ 15; Trial Testimony of Guadalupe Cruz, September 17, 2020.  The court finds this testimony to be credible.

13.    Later the parties met at Plaintiff Yvette Walden's home to discuss the construction project at least for a few hours, and Defendant reviewed the plans that Plaintiffs had in detail, i.e., the Wole Plans, and agreed to do the remodel of the Property and adding the second floor according to the plans.  Cruz Trial Declaration, ¶ 11; Trial Testimony of Guadalupe Cruz, September 17, 2020; Walden Trial Declaration, ¶ 11.  The parties met a few more times in November and December 2015 at Plaintiff Yvette Walden's home to go over the details of the project.  Cruz Trial Declaration, ¶ 18; Trial Testimony of Guadalupe Cruz; Debbie Cruz Trial Declaration, ¶¶ 19-25.

14.    At these meetings, Plaintiffs told Defendant that they had received an estimate/quote from licensed contractors at over $400,000 and even at around $600,000.  Plaintiffs also stated that they received an estimate/quote from a non-licensed contractor at around $300,000. Ms. Fernandez told Plaintiffs that she would perform the entire construction job for $250,000 based on her review of the original Wole Plans.   Cruz

Trial Declaration, ¶¶ 8, 9, 16, 17; Trial Testimony of Guadalupe Cruz, September 17, 2020; Walden Trial Declaration, ¶ 9; Fernandez Trial Declaration, ¶¶ 3-8; Trial Testimony of Martha Fernandez, September 24, 2020.

15.    At these meetings, Defendant told Plaintiffs that she had many years of experience and "lots of experience."  Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020; Debbie Cruz Trial Declaration, ¶¶ 13-20; Trial Testimony of Debbie Cruz, September 17, 2020.  However, during her 25 years of her construction experience, including 13 years in her own construction company, Defendant was involved in around 1,000 remodeling jobs, most of which were cosmetic remodeling with no demolition, and only 10 of these 1,000 jobs were "owner build" home additions that required a building permit.  Trial Testimony of Martha Fernandez, September 17, 18 and 24, 2020. Defendant admitted in her trial testimony that she never built a new home and that she never built a second story to a house.  *Id*.

16.    Mrs. Cruz told Defendant, prior to agreeing to the construction project, that it was very important to her to have this job done by a licensed contractor because it was such a big project, which the court finds to be credible testimony.  Cruz Trial Declaration, ¶ 15.

17.    Defendant told Plaintiffs that she was a licensed contractor.  Cruz Trial Declaration, ¶¶ 15, 20; Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020; Trial Testimony of Yvette Walden, September 17, 2020; Debbie Cruz Trial Declaration, ¶ 11; Trial Testimony of Debbie Cruz, September 17, 2020.  The court finds this testimony to be credible.  Defendant's testimony that she never told Plaintiffs that she was a licensed contractor is not credible.  Fernandez Trial Declaration, ¶ 7; Trial Testimony of Martha Fernandez, September 18, 2020.

18.    Defendant is not and never was a licensed contractor.  Admitted Fact No. 8, Amended Joint Pretrial Stipulation; Fernandez Trial Declaration, ¶ 7.

19.    Defendant told Plaintiffs that her company, First Choice Remodeling, was

6

"licensed" according to Plaintiffs' testimony, which the court finds to be credible

testimony.  Cruz Trial Declaration, ¶ 20; Debbie Cruz Trial Declaration, ¶ 11; Trial

Testimony of Debbie Cruz, September 17, 2020.  First Choice Remodeling was not

licensed as a general contractor.  Fernandez Trial Declaration, ¶¶ 2, 7.

20.    At their second and later initial meetings between Plaintiffs and Defendant,

Defendant discussed the necessary building permits to do the construction project, and

she told Plaintiffs that it would be less expensive for everyone if Plaintiffs applied for the

permits as owner-builders to remodel the house and that she would not have to use her

license which would cost more to obtain the permits.  Cruz Trial Declaration, ¶ 23; Trial

Testimony of Guadalupe Cruz, September 17 and 24, 2020; Debbie Cruz Trial

Declaration, ¶ 22.  It was Defendant's idea for Plaintiffs to apply for building permits as

owner-builders.  *Id*.  The court finds this testimony on these points to be credible.

21.    According to Defendant in her testimony in her trial declaration, Plaintiffs

told her that their previous quote for the construction project was too high and that they

were looking for a lower quote, and Defendant explained to Plaintiffs that her company

could do the addition for about $250,000 without a contractor's license if Plaintiffs could

get a homeowner's build permit on their own.  Fernandez Trial Declaration, ¶¶ 8-9; Trial

Testimony of Martha Fernandez, September 24, 2020.  According to Defendant, after she

explained this to Plaintiffs, they agreed.  *Id*.  Defendant in her trial declaration also

testified: "At no point, I represented that I was a licensed contractor."  Fernandez Trial

Declaration, ¶ 9; Trial Testimony of Martha Fernandez.  Defendant's testimony directly

contradicts Plaintiffs' testimony on these points, and the court finds that Plaintiffs'

contradictory testimony to be credible and Defendant's testimony not to be credible.

22.    Defendant told Plaintiffs that licensed subcontractors worked for her

company, which was a misleading statement because her workers were not licensed

contractors and she did not always have licensed subcontractors working for her as when

she started the job for Plaintiffs, she did not have any licensed subcontractors on the job.

Trial Testimony of Martha Fernandez, September 18, 2020; Trial Testimony of Debbie Cruz, September 17, 2020.

23.    Mrs. Cruz asked Defendant if she had worker's compensation insurance for her workers, and Defendant told Mrs. Cruz that she had her workers signed waivers. Cruz Trial Declaration, ¶ 23.  Defendant admitted at trial that she never obtained such waivers from her workers.  Trial Testimony of Martha Fernandez, September 18, 2020. Defendant testified that her workers were independent contractors, and even though they worked for her, she did not obtain worker's compensation insurance for them.  Trial Testimony of Martha Fernandez, September 18 and 24, 2020.

24.    Defendant told Plaintiffs that she would get the necessary permits from the City of Los Angeles, as required, according to Plaintiffs' credible testimony.  Trial Testimony of Guadalupe Cruz, September 17, 2020.  At trial, Ms. Fernandez testified that she did help Mrs. Cruz obtain permits to do the work but helped her do that only as an "agent".  Trial Testimony of Martha Fernandez, September 17, 2020.   According to Defendant, she went with her owner-builder permit clients to the city to apply for building permits to help them feel "comfortable" because they did not know what to do or say.  Trial Testimony of Martha Fernandez, September 17 and 18, 2020.

25.    Based on Defendant's above representations, Plaintiffs agreed to have Defendant do the remodeling and build the second story on the home for $250,000.  In early-December 2015, Plaintiffs entered a written contract with Defendant to complete the remodeling at around $250,000. This was based on the Wole Plan.  Cruz Trial Declaration, ¶¶ 16, 17, 18, 25; Trial Declaration of Guadalupe Cruz, September 17 and 24, 2020; Fernandez Trial Declaration, ¶¶ 3-6, 8.  (A copy of this initial written contract was not offered in evidence at trial.  Trial Testimony of Martha Fernandez, September 24, 2020.)

26.    At the time the original contract was entered into in early December 2015, Mrs. Cruz and her husband could afford to pay $250,000 for the project and no more, and

they would not have entered into any agreement to extensively remodel their home if the cost was more than $250,000 because they could not pay more.  Cruz Trial Declaration, ¶ 16; Trial Testimony of Guadalupe Cruz, September 24, 2020.

27.     Plaintiffs relied on Defendant's representations because they reviewed her company website which was very impressive, Defendant appeared to have employees based on the work that they saw at the Long Beach project, and Defendant expressly represented to them that she was a licensed contractor and had licensed contractors working for her.  Cruz Trial Declaration, ¶¶ 15, 20; Trial Testimony of Guadalupe Cruz, September 17, 2020; Debbie Cruz Trial Declaration, ¶ 21; Walden Trial Declaration, ¶ 8.

28.     The Property was worth $450,000 when the work began in late 2015, according to Plaintiffs.  Cruz Trial Declaration, ¶ 44; Walden Trial Declaration, ¶ 26.  In her testimony, Mrs. Cruz described the basis of her valuation opinion: "I know that because I looked at many homes in the area and online," "[t]he property was very similar to many other properties in the area" and "[w]e would also receive flyers from agents who were interested in our property."  Cruz Trial Declaration, ¶ 44.  The testimony of Ms. Walden on the basis of her valuation of the Property was substantially similar: "When we hired Ms. Fernandez in late 2015, the property with the two homes was worth $450,000.  I know that because I looked at many homes in the area during the time that were for sale or were owned by friends of ours.  The property was very similar to many other properties in the area.  We were always getting flyers about other properties." Walden Trial Declaration, ¶ 26.

29.     Mrs. Cruz said that she also discussed the value of the Property with realtors in the neighborhood, but admitted that she did not have the Property formally appraised.  Trial Testimony of Guadalupe Cruz, September 24, 2020.  Mrs. Cruz also admitted that her valuation opinion did not account for costs of sale or escrow expenses. Trial Testimony of Guadalupe Cruz, September 24, 2020.

30.     Plaintiffs had a first mortgage on the home of approximately $372,000

when the work began in late 2015.    Cruz Trial Declaration, ¶ 45; Exhibit 9, Mortgage

Account Statement.

   31.  The parties agreed that the project would be a "homeowner build."

Defendant started working on the subject property and Mrs. Cruz obtained several

necessary permits to perform the project as an "owner-builder." Mrs. Cruz also signed

owner-builder declarations under penalty of perjury.    According to the testimony of Mrs.

Cruz, Defendant proposed that Mrs. Cruz should obtain the required permits as an owner-

builder because that would save her money on the costs of the permits.    Defendant later

went with Mrs. Cruz to the City of Los Angeles to apply for the permits and did

everything required to get the permits except actually sign the required forms which Mrs.

Cruz signed only when Defendant showed her where to sign and which buttons on the

city's electronic device to click.    Stipulation of November 13, 2020 re: Disputed Issues of

Facts No. 1 and 3 from Amended Joint Pretrial Stipulation; Cruz Trial Declaration, ¶ 23;

Trial Testimony of Guadalupe Cruz, September 17, 2020; Exhibit 7, Los Angeles City

Applications for Building Permit and Certificate of Occupancy.    According to

Defendant's testimony, Mrs. Cruz knew and understood that she was applying for

building permits on her own as a "homeowner-builder" and that she read and understood

the building permit forms that she filled out at the city building department.    Trial

Testimony of Martha Fernandez, September 18, 2020.    The court finds that Mrs. Cruz's

testimony on these points to be credible and that Defendant's testimony contradicting

Mrs. Cruz's testimony to be not credible in light of Mrs. Cruz's lack of experience in

remodeling and Ms. Fernandez's many years of experience in the construction business.

   32.  Defendant testified at trial that Plaintiffs as owner-builders could hire

whoever they wanted to do the job on an owner-builder permitted project, including her

and her business, to help them as owner-builders on this project.    Trial Testimony of

Martha Fernandez, September 18, 2020.    However, this statement is legally incorrect.

The owner-builder building permit applications to the City of Los Angeles signed by

Mrs. Cruz for the project for which Defendant and her business were doing the work contained the attestation by Mrs. Cruz as the applicant: "I, as the owner of the property, or my employees with wages as their sole compensation, will do the work, and the structure is not intended or offered for sale.  (**Section 7044, Business and Professions Code:** The Contractors License Law does not apply to an owner of property who builds or improves thereon, and who does such work himself or herself or through his or her own employees, provided that such improvements are not intended or offered for sale . . . .)."  When Mrs. Cruz signed these applications, she only read the first word and did not read the applications through as Defendant indicated to her that where to sign when they went to the city building department to make these applications.  Trial Testimony of Guadalupe Cruz, September 24, 2020.  Mrs. Cruz testified that Defendant did not explain these provisions to her.  Trial Testimony of Guadalupe Cruz, September 24, 2020.

33.    Defendant knew that a Los Angeles city building permit could only be obtained by a licensed contractor or a homeowner-builder, that she could not get the permits on her own, that Plaintiffs did not qualify to be owner-builders because they had no employees of their own who could perform the construction work and that her workers who were not Plaintiffs' employees were doing the work. [3]  Trial Testimony of Martha Fernandez, September 17 and 18, 2020; Exhibit 7, Los Angeles City Applications for Building Permit and Certificate of Occupancy.  Defendant accompanied Mrs. Cruz to apply for the owner-builder building permits at the city, knowing that Plaintiffs did not properly qualify for owner-builder permits, and did not tell Mrs. Cruz that it would be incorrect for her to sign these applications, but rather just indicated to Mrs. Cruz where to sign on the applications.  Trial Testimony of Guadalupe Cruz, September 24, 2020; Trial

---

[3]  The court infers that Defendant had such knowledge because she performed construction work for homeowners on 10-11 owner-builder projects, including Plaintiffs, and as their agent, she helped these homeowner customers obtain owner-builder permits.  Defendant accompanied her "owner-builder" customers, including Mrs. Cruz, to apply for building permits because they did not know "how to do" the permit process and she did, and she admitted at trial, she coached them on how to fill out the owner-builder permit applications.  Trial Testimony of Martha Fernandez, September 17 and 18, 2020.

Testimony of Martha Fernandez, September 18, 2020; Exhibit 7, Los Angeles City

Applications for Building Permit and Certificate of Occupancy.

   34. As previously noted, the Property consisted of two small houses on a small

but only lot.  Cruz Trial Declaration, ¶ 5.  Debbie Cruz and her husband, who lived in the

front house on the Property prior to the beginning of construction, moved out when

construction began on December 7, 2015.  Cruz Trial Declaration, ¶ 22; Debbie Cruz

Trial Declaration, ¶¶ 3-4; Trial Testimony of Debbie Cruz, September 17, 2020;

Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 16 from Amended Joint

Pretrial Stipulation.  The son of Plaintiffs Guadalupe and Jose Cruz, Louis, was living in

the back house on the Property, but moved out shortly before construction started.  Cruz

Trial Declaration, ¶ 5.

   35. During their meetings with Defendant in November 2015, Plaintiffs

discussed tearing down the back house of the Property to start the project with Defendant,

and Mrs. Cruz said that her son Louis could do the demolition work through the company

he worked for, American Integrated Services, Inc., and Defendant was "fine" with that,

and the back house was demolished by Mrs. Cruz's son so that Defendant could get

started with the project.  Cruz Trial Declaration, ¶ 21; Trial Testimony of Guadalupe

Cruz, September 17, 2020.

   36. Mrs. Cruz made the following payments to Ms. Fernandez to perform the

work. Admitted Fact No. 14, Amended Joint Pretrial Stipulation; Cruz Trial Declaration,

¶¶ 18, 25, 29, 30; Fernandez Trial Declaration, ¶ 18; Trial Testimony of Martha

Fernandez, September 24, 2020; Cancelled Checks, Exhibit 2;  Stipulation of November

13, 2020 re: Disputed Issue of Fact No. 19 from Amended Joint Pretrial Stipulation:

| | |
|---|---|
| $10,000 | December 4, 2015 |
| $7,548 | December 26, 2015 |
| $42,000 | January 7, 2016 |

| $20,000 | February 5, 2016 |
| $20,000 | February 29, 2016 |
| Total $99,548 | |

37.     After receipt of the initial check, Ms. Fernandez sent some day laborers to the Property who proceeded to remove all of the personal property and fixtures inside, as well as interior walls, and everything down to the existing frame.  Cruz Trial Declaration, ¶ 24; Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020; Walden Trial Declaration, ¶ 14.

38.     According to Defendant, within a few weeks of starting the project, she learned that the existing foundation was inadequate to support a second level, which had not been checked or noted in the Wole Plans for Plaintiffs' project.  Admitted Fact No. 9, Amended Joint Pretrial Stipulation; Fernandez Trial Declaration, ¶¶ 12-13.

39.     Defendant confirmed the inadequacy of the foundation with another licensed engineer, Hugo Vasquez, on or about December 23, 2015, and then immediately informed Plaintiffs.  Walden Trial Declaration, ¶¶ 16-17; Fernandez Trial Declaration, ¶¶ 12-13; Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 11 from Amended Joint Pretrial Stipulation.

40.     Plaintiffs met with Defendant and Luis Hernandez at the subject property and was advised of such finding. Defendant explained that the existing structure, the front house, had to be removed to re-do the foundation to build a second floor.  Defendant also explained that the Wole Plan had to be revised and re-approved, and then a new building permit needed to be obtained.  Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 11 from Amended Joint Pretrial Stipulation; Fernandez Trial Declaration, ¶¶ 12-16; Trial Testimony of Guadalupe Cruz, September 17, 2020.

41.     In Defendant's view, it was an "unforeseen event [that] occurred when it was determined that the existing foundation was not adequate to add a second floor" and

that "[t]he foundation had to be fixed first and the plan had to be revised."  Fernandez
Trial Declaration, ¶ 12.

42.    According to Defendant, she further explained to Plaintiffs the additional
cost to re-do the foundation and the possibility of needing a licensed contractor in the
future, based on the permit status.  Fernandez Trial Declaration, ¶¶ 12-16; Cruz Trial
Declaration, ¶ 27.  Also, according to Defendant, "[t]here have been change of
circumstances due to the foundation issue, which was unknown to the parties at the time
contract was agreed" and "[t]his project is no longer a remodeling or addition, but rather
a demolition and building a new house, which is more costly and more time-consuming."
Fernandez Trial Declaration, ¶ 19.

43.    After the initial work was done and the existing home almost completely
gutted, Ms. Fernandez presented a "Customer Invoice" to Plaintiffs, dated December 29,
2015.  Cruz Trial Declaration, ¶ 28; Trial Testimony of Guadalupe Cruz, September 17,
2020; Walden Trial Declaration, ¶¶ 12-19; Fernandez Trial Declaration, ¶¶ 12-16.  The
invoice provided that the price for completion of the project would be $351,375 and was
signed by Plaintiff Yvette Walden on behalf of Plaintiffs.  Admitted Fact No. 4,
Amended Joint Pretrial Stipulation; First Choice Remodeling, Customer Invoice dated
December 29, 2015, Exhibit 1.  Although the parties have stipulated that there was no
written agreement or contract between Plaintiffs and Ms. Fernandez beyond the Customer
Invoice, the testimony at trial indicates that the initial contract was in writing, but not
offered into evidence.  Admitted Fact No. 4, Amended Joint Pretrial Stipulation; Trial
Testimony of Martha Fernandez, September 24, 2020.

44.    Mrs. Cruz was very upset about the $100,000 price increase but agreed to
that price because she felt she had no choice since the home had been gutted by that time.
Mrs. Cruz testified at trial that Plaintiffs had "no other choice" because the interior of the
remaining front house had been "torn apart."  Trial Testimony of Guadalupe Cruz,
September 24, 2020.  Plaintiffs responded to Defendant that they still wanted to proceed

to add the second floor because it was important to have a second-story house. According to Plaintiff Yvette Walden, Defendant finally convinced Plaintiffs to agree to the increased price by assuring them that they could refinance and obtain a loan against the Property and cover the additional cost. Defendant still had not told Plaintiffs that she was not a licensed contractor. Accordingly, a revised contract was entered into on or about December 29, 2015. The parties agreed to the increased price of around $352,000 based on the changes. Admitted Fact No. 4, Amended Joint Pretrial Stipulation; Cruz Trial Declaration, ¶ 28, 36, 37; Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020; Walden Trial Declaration, ¶¶ 12-17.

45. At the time the revised contract was entered into on or about December 29, 2015, Mrs. Cruz's and her husband's only income was social security and pension income. Trial Testimony of Guadalupe Cruz, September 24, 2020.

46. In January and February 2016, Defendant continued to work on the subject property by removing existing structure so that the foundation could be fixed first, as explained. Defendant also was working on obtaining a revised plan through Mr. Vasquez. Cruz Trial Declaration, ¶¶ 30-31; Trial Testimony of Martha Fernandez, September 24, 2020.

47. During this time, Plaintiff Guadalupe Cruz visited the subject property almost every day to observe the progress and the demolition of the existing structure. In or about February 2016, Defendant and her workers had demolished the Property down to a couple of walls and Plaintiffs had paid Defendant almost $80,000. Cruz Trial Declaration, ¶¶ 30, 31, 35; Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020; Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 6 from Amended Joint Pretrial Stipulation. According to Mrs. Cruz, she was in absolute shock that the entire house had been demolished, but when she confronted Defendant, Defendant told her that she had to do that because of the problem with the foundation. Cruz Trial Declaration, ¶ 32. According to Defendant, the demolition of the entire front house was

no surprise to Plaintiff because she had explained to them that the project had changed due to the faulty engineering plan, and the change was shown in the revised contract that stated the revised scope of work provided "re-structural existing foundation and framing as plans changed." Trial Testimony of Martha Fernandez, September 18 and 24, 2020; First Choice Remodeling, Customer Invoice dated December 29, 2015, Exhibit 1.

48.    Defendant continued to work on the subject property into March 2016. There were still two existing walls standing on the subject property, in efforts to get the permit issued for remodeling instead of as a new addition. Fernandez Trial Declaration, ¶ 17; Trial Testimony of Martha Fernandez, September 24, 2020.

49.    During this time, a city inspector visited the property and indicated that Plaintiffs would need to obtain a new building permit with the revised plan and also have a licensed contractor on site when it was time to pour the concrete foundation. At this time, a new building permit was required to do the job because the job was no longer classified as a remodel. Fernandez Trial Declaration, ¶ 20; Trial Testimony of Martha Fernandez, September 24, 2020; Debbie Cruz Trial Declaration, ¶ 42; Trial Testimony of Guadalupe Cruz, September 17, 2020.

50.    When Ms. Fernandez and Mrs. Cruz went to the City of Los Angeles to apply for the new permit, Ms. Fernandez was unable to apply for a new build or addition permit because she was an unlicensed contractor. According to Plaintiffs' testimony, Ms. Fernandez disclosed to Plaintiffs, for the first time, that she was not a licensed contractor which the court finds to be credible testimony. Cruz Trial Declaration, ¶¶ 36-38. In her trial declaration, Mrs. Cruz stated:

> Shortly after that [i.e., the project was shut down by the city building inspectors in February 2016] Ms. Fernandez told me that she and I needed to go to the city to get the new permit to building the new home. When we were there to apply for a permit to building the new home, Mr. Shang, asked for Ms. Fernandez' license and documentation because only licensed contractor could apply and obtain such permit. Ms. Fernandez became very nervous, wrapped up the conversation and told the official that we will be back with all the documents. As Ms. Fernandez

> was acting strangely, I kept asking her about what had just happened.  In the
> parking lot, she stopped walking and became very sick.  She told me that she
> cannot apply for the permit because she is not a licensed contractor.  That is the
> first time I learned that she did not have a license.  I would have never given her
> the job had I known that.  After that trip downtown, Ms. Fernandez kept assuring
> me that everything was going to be alright.  I was very scared and felt I had no
> choice.  She said that as soon as the permit was issued, she would start pouring
> concrete.  But she still had not even bought the lumber she promised.
> Nevertheless I gave her another payment of $20,000 on February 29, 2016.

Cruz Trial Declaration, ¶¶ 36-38.  The court finds this specific testimony of Mrs. Cruz to
be very credible.

51.    Plaintiffs agreed to allow Defendant to continue to work on the project, but
made an arrangement not to make further payments until the foundation was complete
and to have Defendant assist with all other aspects of getting the new building permit
issued.  Cruz Trial Declaration, ¶¶ 36-42; Trial Testimony of Guadalupe Cruz, September
24, 2020; Exhibits 5 and 6, Text Communications between Guadalupe Cruz and Martha
Fernandez.

52.    Defendant continued to work on the subject property to remove the existing
foundation and set the ground and framing for the new foundation. The remaining walls
were eventually removed due to the measurements on the plan.  Trial Testimony of
Martha Fernandez, September 24, 2020; Trial Testimony of Guadalupe Cruz, September
17, 2020; Walden Trial Declaration, ¶¶ 18-25; Debbie Cruz Trial Declaration, ¶ 47.

53.    Defendant continued to work with Mr. Vasquez, the engineer she consulted
with, to get the revised plan completed and approved. Once Mr. Vasquez informed
Defendant that he revised the plan, Defendant submitted the revised plan to the City of
Los Angeles Building Department; then the city plan checkers from various departments
reviewed and sent the plan back for further revisions. This process took many months.
Trial Testimony of Martha Fernandez, September 18 and 24, 2020.

54.    Defendant also assisted Mrs. Cruz with miscellaneous paperwork, including
but not limited to rental housing, and master covenant documents, and to proceed with

the project. Each time Mrs. Cruz and Defendant went to the city, they met with the city inspector who reviewed the permit application, specifically the owner-builder declaration. Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 7 from Amended Joint Pretrial Stipulation.

55.    Mrs. Cruz signed all owner-builder declarations, which acknowledged that she was conducting the project without a licensed contractor. Mrs. Cruz specifically did not mark the section where it states that "I am contracting with licensed contractors to construct the project." Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 3 from Amended Joint Pretrial Stipulation; Exhibit 7, Los Angeles City Applications for Building Permit and Certificate of Occupancy; Trial Testimony of Guadalupe Cruz, September 17, 2020.

56.    During the visit to the city on or about May 24, 2016, the city inspector explained that a new building permit would be required after getting a demolition permit. A new building permit was needed since the subject property no longer qualified as remodeling because all of the existing walls were removed. Admitted Fact No. 13, Amended Joint Pretrial Stipulation.

57.    Plaintiffs did obtain the new building permit after the revised plan was approved. Exhibit 7, Los Angeles City Applications for Building Permit and Certificate of Occupancy; Trial Testimony of Guadalupe Cruz, September 17, 2020; Trial Testimony of Martha Fernandez, September 24, 2020.

58.    The revised new plan was approved on or about March 16, 2017. Fernandez Trial Declaration, ¶ 30; Walden Trial Declaration, ¶ 25; Trial Testimony of Guadalupe Cruz, September 17, 2020.

59.    The new building permit for the project was issued on or about April 5, 2017. Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 20 from Amended Joint Pretrial Stipulation; Fernandez Trial Declaration, ¶ 30; Cruz Trial Declaration, ¶ 42; Trial Testimony of Guadalupe Cruz, September 17, 2020; Walden

Trial Declaration, ¶ 25; Exhibit 7, Los Angeles City Applications for Building Permit and Certificate of Occupancy.

60.     After a new building permit was obtained, some work was done making footings for the new foundation necessary to build a two-story house on the Property. Defendant had hired Hugo Gil, who had previously worked with Defendant on other projects as a licensed contractor, as a subcontractor. Mr. Gil was on-site and met with city inspectors to get the permits approved since November 2016. Upon permits being issued, Mr. Gil and other workers proceeded with the concrete foundation work which was completed by the end of April 2017.  Fernandez Trial Declaration, ¶ 31; Cruz Trial Declaration, ¶ 42; Trial Testimony of Guadalupe Cruz, September 17, 2020; Walden Trial Declaration, ¶¶ 24-25.

61.     According to Defendant, she was ready to move onto the next steps on the project and Plaintiffs refused to pay the remaining balance on the revised contract and prevented Defendant from doing further work. Plaintiffs sent a termination letter to the Defendant on or about May 12, 2017.  Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 21 from Amended Joint Pretrial Stipulation; Fernandez Trial Declaration, ¶ 31; Trial Testimony of Martha Fernandez, September 24, 2020; Walden Trial Declaration, ¶ 25.

62.     Plaintiffs did not have the funds to complete the project at the increased price as they were unable to obtain a loan on the Property despite Defendant's suggestion at the time the contract was revised that they could finance the project at the additional cost with a new loan when the project was completed.  Trial Testimony of Guadalupe Cruz, September 24, 2020.

63.     According to Mrs. Cruz, during 2016 and into 2017, she and her husband attempted to get a loan to hire a licensed contractor to finish the job, but no lender would give them a loan to complete the project.  In her view, the only collateral for a loan was the Property which was then a vacant lot with incomplete footers and no permit.  Cruz

Trial Declaration, ¶ 43; Trial Testimony of Guadalupe Cruz, September 24, 2020.  Mrs.

Cruz also acknowledged that she and her husband were unable to obtain a loan due to

insufficient income.  Trial Testimony of Guadalupe Cruz, September 17 and 24, 2020.

64.    Defendant used the payments made by Plaintiffs to her for improvements of

the Property.  Stipulation of November 13, 2020 re: Disputed Issue of Fact No. 24 from

Amended Joint Pretrial Stipulation; Trial Testimony of Martha Fernandez, September 24,

2020.

65.    Plaintiffs are still the owners of the Property, but the Property is pending

foreclosure and they expected that it will be lost in foreclosure.  Cruz Trial Declaration,

¶ 45; Trial Testimony of Guadalupe Cruz, September 24, 2020.  According to Mrs. Cruz,

she and her husband stopped paying the mortgage in 2019 because they were unable to

pay both their apartment rent and the mortgage on the Property, so a foreclosure is

pending and she expected the Property to be lost soon.  Cruz Trial Declaration, ¶ 45;

Cruz Trial Testimony, September 24, 2021. [4]

66.    According to Mrs. Cruz, Plaintiffs have been damaged from the demolition

of the houses on the Property due to Defendant's misrepresentations as before the project,

they had two houses, but now the Property is a vacant lot with incomplete footers and

without a building permit, and while they attempted to get a loan to hire a licensed

contractor to finish the project, they are unable to obtain a loan on the property in this

condition.  Cruz Trial Declaration, ¶¶ 43-48; Trial Testimony of Guadalupe Cruz,

September 17 and 24, 2020; Walden Trial Declaration, ¶¶ 19-26.

67.    Plaintiffs filed a complaint for breach of contract and return of

compensation against Defendant pursuant to California Business & Professions Code

§7031(b) in the Superior Court of California, Case Number NC061235, which case is still

pending.  Admitted Fact No. 6, Amended Joint Pretrial Stipulation.

---

[4]  The parties did not offer evidence that a foreclosure has actually occurred.  It may well be that the lender has not
foreclosed to avoid premises liability in light of the incomplete construction on the Property.

68.    Ms. Fernandez filed this Chapter 7 bankruptcy case on July 17, 2018. Defendant's Voluntary Bankruptcy Petition, Exhibit 11.  In her schedules, filed under penalty of perjury, Defendant's Voluntary Bankruptcy Petition, Exhibit 11, she did not disclose that she owned any businesses for the past four years which was not true, Petition, Exhibit 11, Bates stamped page 232, question 27.  She also denied that she owned any interest in "incorporated and unincorporated business, including an interest in an LLC, partnership and joint venture" which was not true.  Petition, Exhibit 11, page 11-208, question 19.  However, she stated her occupation as "Business Owner," listed her income on Schedule I as coming from her employer, First Choice Remodeling, so the entity must have still existed at the time Defendant filed her bankruptcy petition. Petition, Exhibit 11, Bates stamped page 222

69.    Ms. Fernandez listed Plaintiff Yvette Walden as a creditor on her bankruptcy schedules as having an unsecured claim of $130,000, which was not listed as disputed.  Petition, Exhibit 11, Bates stamped page 218.

## CONCLUSIONS OF LAW

In their complaint, Plaintiffs seek a determination of nondischargebaility of debt under 11 U.S.C. § 523(a)(2)(A) which provides in pertinent part that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services . . . to the extent obtained by . . . (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  Complaint, Docket No. 1.

The elements of a claim under 11 U.S.C. § 523(a)(2)(A) are: (1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) the debtor made those representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on these representations; and (5) the creditor sustained losses as a proximate result of the debtor's representations. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000).

A claim under 11 U.S.C. §523(a)(2)(A) is proven by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991).

The amount of the debt that Defendant may owe Plaintiffs has not been liquidated as their lawsuit in state court against Defendant is still pending.  Plaintiffs in this adversary proceeding assert liability of Defendant for a debt owed to them based on the tort of fraud.  Under California law, "[t]he elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th 951, 973–981 (1997).  The elements of a claim for the tort of fraud under California law is substantially similar, if not identical, to the elements of a claim under 11 U.S.C. § 523(a)(2)(A).  Fraud is shown under California law by a preponderance of the evidence.  *Liodas v. Sahadi,* 19 Cal.3d 278, 287-293 (1977), *citing inter alia,* California Evidence Code § 115.  As discussed below, Plaintiffs have shown by a preponderance of the evidence all of the elements to establish Defendant's liability in tort for a debt owed to them based on fraud under California law applicable here and that such debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

**Misrepresentation, false representation, concealment or nondisclosure.**

Plaintiffs contend that Defendant made several false representations to them Plaintiffs, prior to entering into the contract with her, as follows:

a.      She told Plaintiffs she had a contractor's license even though she did not have a contractor's license.

b.      She told Plaintiffs several times that she had "tons of experience" doing projects like this one, which she did not.

c.      She told Plaintiffs that her company, First Choice Remodeling, was "licensed" which it was not licensed as a general contractor.

d.    She told Plaintiffs that she had licensed contractors working for her

company, a statement that was misleading because her workers were not licensed

contractors.

e.    She told Plaintiffs that her foreman and workers would do the work on the

project, implying to Plaintiffs that they were her employees, but in fact, she had no

employees as she treated every person who worked for her as an independent

contractor and she did not provide worker's compensation insurance for any

person.

f.    She represented to Plaintiffs she could do the work set forth in the plan for

$250,000 which she could not.

Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Docket No. 86, filed on

December 21, 2020, at 6-7.

In response, with respect to her alleged misrepresentation of being licensed,

Defendant contends that there was no such representation because as she testified, she did

not state or imply that she was a licensed contractor as she is not and never was and she

had told Plaintiffs that her company would be able to do the project with a licensed

contractor.  Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No.

90, filed on February 12, 2021, at 9.  Defendant further contends that as she testified,

Mrs. Cruz told her that Plaintiffs had a budget of $250,000 and could not afford the

higher quotes given by other licensed contractors of $400,000 to $600,000, so Defendant

responded that her company could do the project for $250,000 under the Wole Plan

without a licensed contractor and if Plaintiffs got an owner-builder permit, and thus,

Plaintiffs entered into the contract with her for $250,000, agreeing to do the project

without a licensed contractor and as owners-builders.  *Id.*  As discussed above, the court

finds Mrs. Cruz's testimony that she directly asked Defendant during the initial meetings

before a contract was signed whether Defendant was a licensed contractor, and Mrs. Cruz

heard Defendant to say yes, and that Defendant told her and her daughter, Debbie Cruz,

on other occasions that she was licensed, to be credible, and the court finds the contrary

testimony of Defendant that she did not state or imply to Plaintiffs that she was a licensed

contractor not to be credible.

In addressing the arguments of the parties, the court first discusses the statutory

framework in California for licensing contractors and applicable exemptions.  In

California, "[p]ersons acting in the capacity of a contractor must be licensed" pursuant to

the California Contractors License Law, California Business & Professions Code, §§

7000 et seq., and "[v]irtually every person (including an individual, a firm, corporation,

co-partnership, association, or other organization, or any combination thereof)1 who

performs, or offers to perform, construction work in the State of California must be

properly licensed at all times during the performance of work, unless exempt from the

licensing requirements."  9 Miller and Starr, *California Real Estate*, § 31:2 (4th edition

online, June 2021 update), citing inter alia, California Business & Professions Code, §

7000 et seq.   According to the California Contractors License Board (CSLB), the

regulatory agency enforcing the California Contractors License Law in its reference

guide for contractors and the public, *California Contractors License Law & Reference

Book* (2020 Edition), "All businesses or individuals who construct or alter, or offer to

construct or alter, any building, highway, road, parking facility, railroad, excavation, or

other structure in California must be licensed by CSLB [California Contractors State

License Board] if the total cost (including labor and materials) of the project is $500 or

more." *See also*, California Business & Professions Code § 7027.2

Under the California Contractors License Law, "the term 'contractor' is

synonymous with 'builder,' and includes 'any person who undertakes to or offers to

undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does

himself or herself or by or through others, construct, alter, repair, add to, subtract from,

improve, move, wreck or demolish any building, highway, road, parking facility, railroad,

excavation or other structure, project, development or improvement . . . .'"  9 Miller and

Starr, *California Real Estate*, § 31:2, *citing and quoting,* California Business &

Professions Code § 7026.  The scope of tasks undertaken by a contractor described in California Business & Professions Code § 7026 is broad.  *Phoenix Mechanical Pipeline Inc. v. Space Exploration Technologies, Inc.,* 12 Cal.App.5th 842, 852 (2017)

 "The definition of 'contractor' includes a consultant to an owner-builder who undertakes, offers to undertake, or submits a bid to construct any building or home improvement project or any portion thereof."  9 Miller and Starr, *California Real Estate*, § 31:2, *citing,* California Business & Professions Code, § 7026.1.  "A 'consultant' is a person, other than a public agency or owner of private property, who either (i) provides or oversees a bid for a construction project, or (ii) arranges for and sets up work schedules for contractors and subcontractors and ministerial oversight of a construction project, for work performed pursuant to a home improvement contract."  *Id.*

An owner-builder is exempt from the requirements of the California Contractors License Law if the following conditions are met:  (1) The owner builds or improves structures on the owner's own property and (a) none of the improvements are intended or offered for sale, and (b) the owner performs the work personally or with the owner's employees with wages as their sole compensation; (2) the owner builds or improves a structure on the owner's own property and either (a) uses a general contractor to perform the work, or (b) contracts directly with duly licensed contractors in the trades involved in completing the work; in either case, however, if the project involves single family residential structures, no more than four must be intended or offered for sale in a calendar year; or (3) the owner is improving the owner's principal place of residence and (a) the work is performed prior to sale, (b) the owner resides in the residence for the 12 months prior to completion, and (c) the owner has not availed himself or herself of the exemption on more than two structures more than once during any three year period.  9 Miller and Starr, *California Real Estate*, § 31:2, *citing and quoting,* California Business & Professions Code, § 7044(a)(1), (2) and (3).

Based on the general definition of "contractor" under California Business &

Professions Code § 7026, Defendant and her company, First Choice Remodeling, were "contractors" subject to the California Contractors License Law as "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement . . . ." in that Defendant and her company undertook or offered "to undertake, or purported to have the capacity to undertake to, or submitted a bid, or does herself or itself, by and through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building . . ." when she and her company offered and accepted a bid to perform construction work on Plaintiff's property by constructing, altering, repairing, subtracting from, improving, moving, wrecking and demolishing the front house on Plaintiffs' property and constructing a new foundation for a new addition to the front house, including a second story, and performing such work.

Based on the specific definition of "contractor" including "a consultant to an owner-builder" under California Business & Professions Code § 7026.1, Defendant and her company, First Choice Remodeling, were "contractors" subject to the California Contractors License Law as consultant to an owner-builder who undertakes, offers to undertake, or submits a bid to construct any building or home improvement project or any portion thereof in that Defendant and her company undertook, offered to undertake and submitted a bid to construct a new addition to Plaintiffs' front house on the Property.

Plaintiffs' construction project did not qualify for the minor contract exception to the California Contractor License Law under California Business & Professions Code § 7027.2 because if the total cost (including labor and materials) of the project of $250,000 as set forth in the original contract and $351,375 as set forth in the revised contract were not less than $500 in order to qualify for the exemption.

Plaintiffs' construction project did not qualify for the owner-builder exception to

the California Contractor License Law under California Business & Professions Code §

7044(a)(1) and (2) because the construction work was not being performed by Plaintiffs

themselves or their employees, but by their contractors, Defendant and First Choice

Remodeling, as neither were licensed nor were they employees of Plaintiffs.

Defendant and her company, First Choice Remodeling, were and are not licensed

contractors pursuant to the California Contractors License Law and acted in violation of

the California Contractors License Law when she and her company offered and accepted

a bid to perform construction work on Plaintiff's property by constructing, altering,

repairing, subtracting from, improving, moving, wrecking and demolishing the front

house on Plaintiffs' property and constructing a new foundation for a new addition to the

front house, including a second story, and performing such work.

As to Plaintiffs' agreement to apply for permits as "owner-builder", the court finds

that this "agreement" does not negate Defendant's misrepresentation about her license

status.  Plaintiffs' testimony that they agreed after Defendant told them that they could

apply for permits as "owner-builder" which would be cheaper to get as Defendant would

not have to use her license was credible and supports a finding that Defendant

misrepresented to them that she had a license, particularly in light of Mrs. Cruz's

testimony that when she and Defendant later went to the city regarding a permit

application, and the city inspector asked Defendant for her license, Defendant and Mrs.

Cruz abruptly left the premises, and Defendant confessed to Mrs. Cruz that she had no

license.  The court finds Plaintiffs' testimony that due to their lack of experience with

remodeling and Defendant's appearance of being a successful licensed contractor based

on years of remodeling experience, they believed Defendant's explanation that they

would save money on permits if they did not have to use her license, and thus, deferred to

Defendant's explanation and recommendation to be very credible.  Defendant's

testimony that Plaintiffs fully understood what it meant to be an "owner-builder", that

they read and understood each "owner-builder" permit application for the project and that

they knew that Defendant was unlicensed and hired her any way because they wanted to remodel their home at a much lower cost is not credible.  The testimony and other evidence shows that Defendant did not tell Plaintiffs the truth when Mrs. Cruz asked Defendant if she was licensed and that they followed Defendant's recommendations on the project in light of their lack of remodeling experience and Defendant's appearance of being a successful licensed construction contractor, and thus, they did what Defendant told them to do when they went to the city to apply for permits, i.e., Defendant guided Mrs. Cruz through filling out the electronic permit application, and Mrs. Cruz just signed the application on the electronic control pad when Defendant showed her.

Defendant contends that Mrs. Cruz fully understood what it meant to be an "owner-builder" as Mrs. Cruz signed owner-builder declarations at least 4-5 times under penalty of perjury, knowing that it was a false statement or with reckless disregard to what was written in the declarations that she signed.  Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No. 90, filed on February 12, 2021, at 17.  The court rejects this contention as the court has found that Mrs. Cruz only signed the owner-builder declarations as guided by Defendant at the city permit office, who was showing Mrs. Cruz how to fill out and sign the permit application, and that having worked on 10-11 owner-builder permitted projects for customers, Defendant knew what her customers were signing under penalty of perjury and urged them to sign.  As Defendant testified at trial, she accompanied her customers to the city permit office because they did not know what to do or say, and she did.  With her 25 years of experience in the construction industry, including 10-11 permitted owner-builder projects, Defendant had knowledge superior to her clients, including Mrs. Cruz, and Mrs. Cruz did what Defendant told her to do and say in applying for the owner-builder permits at the city.  Defendant knew it was improper for Mrs. Cruz to sign the owner-builder declarations to get the permits for her and her company to do the work on the owner-builder projects as she knew that she and her company were not owner-builders themselves or employees of the owner-

builders.  Thus, Defendant did not dissuade her customers like Mrs. Cruz from signing such declarations at the city permit office, but she was motivated to have them so sign and advised them to do so in order for her and her company to perform the contracted construction work.

With respect to Defendant's alleged representation regarding her construction contracting experiences to provide the services she agreed to perform under the contract, she contends that there was no misrepresentation.  Defendant testified that she had worked at construction companies and for licensed contractors for over 15 years and had her own company for about 11 years when she entered the contract with Plaintiffs, that she and her company had done hundreds of remodeling projects, including 10-11 projects that required building permits, that she and her company did 1-2 permit projects over the 5-10 year period before taking on Plaintiffs' project, that Defendant had worked with licensed contractors on previous project, that she had them available for this project to complete the services under the contract, that although Defendant had not built a new house on her own before, she had the ability to hire subcontractors with the necessary experience and knowledge, that Plaintiffs' property was properly demolished, restructured and a new concrete foundation was completed, that the work was not defective and that Defendant was willing and able to complete the services under the contract when Plaintiffs terminated her services. Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No. 90, filed on February 12, 2021, at 11.

As discussed above, Plaintiff Guadalupe Cruz's testimony was that Defendant represented to her that she [Defendant] was a licensed contractor and had many years of experience.  This testimony was credible.  Defendant's testimony and contentions about her experience are very problematic because they are tied to her misrepresentation that she was a licensed contractor.  Defendant's representations that she had many years of experience were misleading because while she may have had many years of experience on remodeling projects that did not require a building permit, her experience with

projects requiring building permits, such as home additions, was very limited, that is, 10 permitted owner-builder projects, and none of them involved a second story addition which was Plaintiffs' project.  In other words, Defendant misrepresented her experience as being a licensed contractor and having relevant experience since her actual experience for Plaintiffs' project adding a second story was minimal or non-existent, and as such, this led her to miscalculate the cost of the project at $250,000, inducing Plaintiffs to hire her and her company, as Defendant having reviewed the plans did not realize that the plans were defective due to the inadequate foundation to support a second story addition and later after consulting a building engineer, increased the cost of the project by $100,000 to Plaintiffs' detriment, which was beyond their ability to afford.

Accordingly, the court finds that the preponderance of the evidence supports some of Plaintiffs' contentions, but not all of them.  The court finds that the preponderance of the evidence supports Plaintiffs' contentions that Ms. Fernandez made several false representations to them, prior to entering into the contract with her, as follows:

a.    She told Plaintiffs she had a contractor's license even though she did not have a contractor's license.

b.    She told Plaintiffs several times that she had "tons of experience" doing projects like this one, which she did not (however, the exact words were more that she had many years of experience doing projects like this as opposed to "tons of experience" which reference the court was not able to find in the testimony).

c.    She told Plaintiffs that her company, First Choice Remodeling, was "licensed" which it was not licensed as a general contractor.

The testimony described in the findings of fact above supports these contentions by a preponderance of the evidence. [5]

---

[5]  However, the court finds that the preponderance of the evidence does not support the other alleged representations that Defendant made that she told Plaintiffs that she had licensed contractors working for her company, a statement that was misleading because her workers were not licensed contractors, that she told Plaintiffs that her foreman and workers would do the work on the project, implying to Plaintiffs that they were her employees, but in fact, she had no employees as she treated every person who worked for her as an independent contractor and she did not provide

**1.    Knowledge of falsity.**

The preponderance of the evidence shows that Defendant at the time she made the misrepresentations to Plaintiffs, knew these statements were false as the statements were within her knowledge that she would have had about her business, her lack of a contractor's license and her lack of prior experience with building a second story addition.

**2.    Intent to defraud.**

The preponderance of the evidence shows that Defendant made the false statements to Plaintiffs for the purpose of being hired to remodel Plaintiffs' home and obtain $250,000 to complete the project.  There are perhaps some mitigating circumstances, however. The increased cost of the project was the result of faulty plans for a new foundation, which was not Defendant's fault, Defendant continued to work on the project to complete the construction after Plaintiffs first learned that she was not licensed and the payments made by Plaintiffs to Defendant were used for improvements of the Property.  Defendant is still liable in this case because she made false representations that she was a licensed contractor in order to induce Plaintiffs to enter into the contract with her so that she could collect a payment of $250,000 to perform the work.  Although Defendant tried to make good on the contract, Plaintiffs would not have suffered their damages that they did, but for their reliance on Defendant's false

worker's compensation insurance for any person and that she represented to Plaintiffs she could do the work set forth in the plan for $250,000 which she could not.  Although Defendant in her testimony said that she told Plaintiffs could have licensed subcontractors if they were needed for the project, the Plaintiffs' testimony indicated that they were satisfied when she told them that she and her company were licensed and apparently did not inquire about subcontractors.  As to the alleged misrepresentation that Defendant told Plaintiffs that her workers would do the work, implying that they were her employees, the evidence indicates that Plaintiffs did not ask Defendant if her workers were employees but rather whether she had worker's compensation insurance for them.  The evidence indicates that she made a misrepresentation to them that she had insurance waivers from them, which was not true. However, this was not the misrepresentation asserted by Plaintiffs after trial in their proposed findings of fact and conclusions of law, and if it were so asserted, there was no evidence indicating any actual damage to them from such a misrepresentation.  As to Defendant's asserted misrepresentation to Plaintiffs she could do the work set forth in the plan for $250,000 which she could not, the evidence indicates to the court that Defendant due to her lack of relevant experience doing permitted home additions miscalculated the cost of the project, which indicates ineptitude and negligence in reviewing the original project plans rather than an intent to mislead Plaintiffs about price.

representations about being licensed because they would not have hired her and incurred the expense of paying Defendant.  Plaintiffs suffered the loss of the houses on their property.  Whatever good faith Defendant may have had in trying to complete the project, it cannot mitigate the fraud that she engaged in in not explicitly telling Plaintiffs that she was not licensed when Mrs. Cruz asked Defendant if she was a licensed contractor. Defendant has been in business as an unlicensed contractor for many years and knew how to get business without being licensed, even if it meant making false representations that she was licensed, which is contrast to Plaintiffs Guadalupe Cruz and Jose Cruz, retirees, former teacher's assistant and factory worker, who had no previous involvement in remodeling.  The fact that Plaintiffs continued to work with Defendant after they found out that she was not licensed does not undo the damages that they suffered in having paid Defendant almost $100,000 for unlicensed construction work and having their two houses demolished without the ability to replace them.

### 3.    Justifiable reliance by the creditor on the debtor's statement or conduct.

Plaintiffs contend that their reliance on Defendant's misrepresentations was justifiable because, as Defendant testified and admitted at the trial, she had told the Plaintiffs that her company was licensed to do the project, that furthermore, Defendant met with the Plaintiffs at one of her job sites where her company remodeled the master bedroom and that Plaintiffs, who again had no experience in construction or remodeling viewed Defendant and her workers doing construction work on a job site and reviewed information about her company on the internet, had no reason to suspect that she was lying.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Docket No. 86, filed on December 21, 2020, at 7-8.

In opposition, Defendant contends that Plaintiffs cannot rely on any alleged misrepresentation by her because they had agreed to do the project at a cost of $250,000 and on an owner-builder permit, they were aware that no licensed contractor would take

on the project at that price, they agreed to do the project as owner-builders after she explained that this meant without a licensed contractor.  Mrs. Cruz had signed the permit application and declaration in that regard, there was an "obvious discrepancy" with Defendant's $250,000 quote if she was licensed with more than 10 years experience, and that they took no means to verify Defendant's license status even in a cursory manner by asking for a contractor's license number or asking family members in the construction business about Defendant.  Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No. 90, filed on February 12, 2021, at 9–10.

In *Field v. Mans*, 516 U.S. 59, 72–75 (1995), the Supreme Court stated that "a person is justified in relying on a factual representation without conducting an investigation, so long as the falsity of the representation would not be patent upon cursory examination."  The falsity here was not "patent upon cursory examination."  Patent means "readily visible or intelligible, obvious," *see* Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/patent (online edition, accessed on May 17, 2021).  The preponderance of the evidence shows that Plaintiffs' reliance on Defendant's misrepresentations that she was licensed and had many years of experience was justifiable because Plaintiffs asked her directly if she was a licensed contractor and she responded yes, and Defendant told them that she could do the project for them, even though she had no experience building a second story home addition.  Defendant gave Plaintiffs the impression that she had enough experience by first meeting with them at one of her job sites where her business was remodeling a master bedroom in a house, Plaintiffs with no experience in construction or remodeling saw Defendant and her workers doing construction work on a job site and reviewed information about her business on the internet, had no reason to suspect that she was lying.

Plaintiffs' testimony that they did not verify whether Defendant was a licensed contractor on the California Contractors State License Board's website because they did not know that they could do that is credible as they had and have no experience in

remodeling or construction.  "A person may justifiably rely on a representation 'even if the falsity of the representation[s] could have been ascertained upon investigation.'"  4 March, Ahart and Shapiro, *Rutter Group California Practice Guide: Bankruptcy,* ¶ 22:481 at 2275 (online edition, December 2020 update), *citing inter alia, In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996).  Plaintiffs could have ascertained upon investigation Defendant's lack of a contractor's license by looking for her on the state's contractor bureau's website, but this does not preclude their reliance from being justifiable since here they did not know better.

**4.      Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.**

Plaintiffs seek damages that they suffered in reliance on the false representations of Ms. Fernandez that she was a licensed contractor in the amounts that they paid her totaling $99,548 for unlicensed construction work by her and her business and the value of at least $80,000 of equity lost from demolition of two livable houses on the Property in reliance on her false representations that she was a licensed contractor.   Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Docket No. 86 at 8-9.

In opposition, Defendant contends that even Plaintiffs have established the other elements of fraud, they are not entitled to damages because first, the claimed $80,000 equity damages are not the proximate result of any misrepresentations since they did not continue with the remodeling project, they cannot claim loss of equity damages from foreclosure since there is no proof of a foreclosure, they have not substantiated the value of equity lost in the case as there is no evidence of accruing interest, taxes and other charges against the Property and estimated sales expenses, and they have not proven loss mitigation efforts to avoid default or foreclosure, and second, Defendant would be entitled to a reduction for her services performed and expenses incurred with respect to services ancillary to the construction work and for which a license is not required. Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No. 90, filed on

February 12, 2021, at 18-19, *citing, Phoenix Mechanical Pipeline Inc. v. Space*
*Exploration Technologies, Inc.,* 12 Cal.App.5th 842 (2017) for the proposition that a
contractor could receive payment for work done which did not constitute "contracting"
work.  According to Defendant, she is entitled to a reduction in damages for such
ancillary services and services, including: (1) payment of $3,500 to Hugo Vasquez to
revise the plan; (2) payment of $1,500 for survey; (3) payment of $350 for soil test; (4)
payment of $2,500 for trash haul; (5) payment of $750 for electrical calculation for the
plan; (6) payment of $550 for beam and joint calculations for the plan; and (7) payment
of $20,000 for materials.  *Id.*

Plaintiffs have demonstrated that they have the right to return of the payments
made to Defendant pursuant to California Business & Professions Code § 7031, which
provides, "(b) . . .  a person who utilizes the services of an unlicensed contractor may
bring an action in any court of competent jurisdiction in this state to recover all
compensation paid to the unlicensed contractor for performance of any act or contract."
"The purpose of this section is to 'protect the public from incompetence and dishonesty
in those who provide building and construction services.'"  *Phoenix Mechanical Pipeline*
*Inc. v. Space Exploration Technologies, Inc.,* 12 Cal.App.5th at 847, *citing and quoting,*
*Hydrotech Systems, Ltd. v. Oasis Waterpark,* 52 Cal.3d 988, 995 (1991). "The section
'advances this purpose by withholding judicial aid from those who seek compensation for
unlicensed contract work.'"  *Id.*  The preponderance of the evidence shows that
Defendant was unlicensed at all times during  the performance of the construction work
by her and her business and that the compensation paid to Defendant for such unlicensed
construction work was $99,548, which must be returned to Plaintiffs pursuant to
California Business & Professions Code § 7031(b).  Thus, Plaintiffs have shown that they
suffered these amounts as damages proximately caused by their reliance on Defendant's
false representations.

The court does not reduce these damages based on the amounts claimed by Defendant as for ancillary services and expenses because while there appears to be no dispute that such amounts were paid to Defendant, the amounts were paid to her for unlicensed construction work, not ancillary services, Defendant used the amounts for expenses incurred in her unlicensed construction work, Plaintiffs did not benefit from such amounts as the project is unfinished, and Plaintiffs did not and do not have the ability to have the project completed due to their inability to obtain a loan to complete the project based on the current state of the Property.

The court determines that Plaintiffs' valuation testimony of the Property and their equity in it as zero to be credible, and determines that they derived no value from the services and expenses of Defendant in the Property.  Plaintiffs Guadalupe Cruz and Yvette Walden testified about the value of the Property before the project started and the amount of equity they had based on the value of the existing mortgage as evidenced by the mortgage statement received into evidence. The court may rely upon the valuation opinions of Plaintiffs as the layperson owners of the Property pursuant to Federal Rule of Evidence 701 regarding the value of the property and diminution of value from the demolition of the houses on the property.  According to Judge Barry Russell in his treatise, *Bankruptcy Evidence Manual,* "Courts have generally held that an owner is competent to give his opinion on the value of his property, often by stating the conclusion without stating a reason."  2 Russell, *Bankruptcy Evidence Manual,* § 701:2 (2019-2020 edition), *citing inter alia, South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Texas,* 614 F.2d 1056, 1061 (5th Cir. 1980); *In re Coppess,* 567 B.R. 893 (8th Cir. BAP 2017); *In re Solis,* 576 B.R. 828 (Bankr. W.D. Tex. 2016).  According to Judge Russell, "This is apparently based upon an assumption that the owner has sufficient knowledge to either testify as a layman under Rule 701 [of the Federal Rules of Evidence] or as an expert under Rule 702."  *Id., citing inter alia,* Advisory Committee Note to Federal Rule of Evidence 702 (recognizing landowners testifying to land values

as a "skilled witness" within the scope of Rule 702).

Regarding the weight to accord to an owner's valuation testimony, Judge Russell comments: "Generally, whether a property owner's testimony as to the value of his property, is received under Rule 701 or Rule 702 makes little difference because if the witness is truly an expert and credible, his testimony will be given great weight and if he has very little or no real expertise, the testimony will be given little if any weight." 2 Russell, *Bankruptcy Evidence Manual*, § 701:2.  Judge Russell further comments:

> However, whether the witness testifies under Rule 701 or rule 702 is significant as to the extent of his testimony.  If testifying under 701, the owner may merely give his opinion based on his personal familiarity of the property, often based to a great extent on what he paid for the property.  On the other hand, if he is truly an expert qualified under the terms of Rule 702 'by knowledge, skill, experience, training or education,' then he may also rely on and testify as to facts 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . ' pursuant to Rule 703.  For example, the average debtor-homeowner who testifies in opposition to a motion for relief from the § 362 automatic stay should be limited to giving his opinion as to the value of his home, but should not be allowed to testify concerning what others have told him concerning the value of his or comparable properties unless, the debtor truly qualifies as an expert under Rule 702 such as being a real estate broker, etc.

*Id.*  In this case, the court determines that Plaintiffs are testifying under Rule 701 in giving their opinions based on their personal familiarity with the Property as the owners and that they are not experts qualified under the terms of Rule 702 "by knowledge, skill, experience, training or education."  That is, Plaintiffs are lay owners and are not real estate professionals, such as licensed real estate brokers, agents or appraisers.  Plaintiffs' valuation testimony is not based on one of the three scientifically accepted methods of real property valuation, such as the market or sales comparables approach, the income approach or the cost approach.  7 Miller and Starr, *California Real Estate*, § 24:26, *citing inter alia, San Diego Metropolitan Transit Development Board v. Cushman*, 53 Cal.App.4th 918, 925-926 (1997) and California Evidence Code, §§ 815-820.

Plaintiffs do not provide specific and meaningful market data, income data or cost data to support a valuation opinion that would be accorded great weight as an expert witness opinion under Rule 702.  In fact, there is very little information in Plaintiffs' testimony about the Property, which does not include such useful information as dimensions of the two demolished houses on the Property and the lot itself, including square footage of the buildings and the yards, the number of rooms in each house, such as bedrooms, bathrooms, and other rooms, and any particular amenities in the houses. Plaintiffs admitted in their testimony at trial that they had not obtained any formal appraisal of the Property.  Plaintiffs' substantially identical testimony that "I know that because I looked at many homes in the area and online," "[t]he property was very similar to many other properties in the area" and "[w]e would also receive flyers from agents who were interested in our property" is not probative as indicating that they made a market or sales comparable approach analysis of valuation as their opinions are devoid of market data relevant to time and place as to the Property.  Plaintiffs have not demonstrated that they are qualified to give an expert type opinion of valuation based on a market or sales comparables approach under Rule 702.  According to Judge Russell, a property owner's testimony as to the value of his or her property received under Rule 701 because he or she has very little or no real expertise will be given little if any weight."  2 Russell, *Bankruptcy Evidence Manual*, § 701:2

The scant information about the Property based on the evidence adduced at trial in support of Plaintiffs' valuation opinion of the Property at $450,000 and equity of approximately $80,000 includes that the Property had two small houses, now demolished, on a small but long lot, Plaintiffs purchased the Property in 2002 for $305,000, the loan balance was approximately $372,000 based on the July 2017 loan account statement in evidence (Exhibit 9), Debbie Cruz and her husband resided in the front house before construction and Louis Cruz, Mrs. Cruz's son, lived in the back house before construction.   On her part, Defendant offered no evidence relevant to valuation of the

Property as there was no expert testimony of valuation offered by her, such as by a qualified real estate broker, agent or appraisal based on one of the scientifically valid method of real property valuation, market, income or cost.

The court determines that Plaintiffs' valuation opinion testimony relating to the Property and their equity is admissible under Rule 701 and is entitled to some weight indicating evidence of their loss from Defendant's actions.  There is no factual dispute about the current condition of the Property as a now vacant lot with the prior two houses in which family members had resided prior to being demolished, though with a new concrete foundation for a new unbuilt front house.  The photographs of the Property from 2016 and 2017 show the unfinished state of construction on the site after demolition and during partial construction.  Exhibit 10.  While Defendant did not actually demolish the back house on the Property, unlike the front house, she is responsible because Plaintiffs were induced to demolish the back house in order to proceed with the construction project that Defendant agreed to do for Plaintiffs.  Plaintiffs' testimony that they are unable to complete construction to mitigate their damages due to lack of funds as Plaintiffs are unable to obtain a loan to complete construction due to lack of income and lack of sufficient collateral due to the unfinished state of construction on the Property is credible.  Their valuation of the Property at $450,000 is plausible based on their 18 year ownership of the Property purchased for $305,000 in 2002.  The amount of the equity is reasonable based on their proof of the loan balance against the Property.  The amount of damages based on loss of equity is plausible based on the unusable condition of the Property now in its unfinished state where previously, Plaintiffs' family members were able to reside in the two houses on the Property, which cannot be done now, and the loss of equity based on the loss of the two houses on the Property is a reasonable representation of Plaintiffs' damages.  The court rejects Defendant's assertions that the loss should be reduced by additional interest, taxes and other fees which may have accrued on the loan and for sale expenses as if the Property were sold for lack of any

legal authority and evidence since neither was cited.  *See* Defendant's Proposed Findings of Fact and Conclusions of Law at 18-19.  Accordingly, the court finds Plaintiffs' testimony and evidence of damages from the loss of equity arising from their justifiable reliance on Defendant's misrepresentations inducing them to contract with Defendant to be credible and reasonable and establishes their damages from Defendant's actions in the amount of $78,000 (valuation of the Property at $450,000 minus the outstanding loan indebtedness of $372,000) by a preponderance of evidence in the absence of countervailing valuation evidence from Defendant.

In their trial brief, Plaintiffs apparently asserted a claim of damages in the amount of $15,000 to install a temporary electrical pole with the Department of Water and Power to shut off the gas and all the permits that were applied for.  Plaintiffs' Trial Brief, Docket No. 35 at 7; Cruz Trial Declaration, ¶ 48.  However, Plaintiffs did not assert such a claim in their proposed findings of fact and conclusions of law and have not otherwise cited to any evidence in support of such claim.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Docket No. 86 at 8-9.  Plaintiffs did not offer at trial any documentary evidence of payment of such expenditure.  The court thus finds that this claim is either abandoned or unsubstantiated and does not award any damages on such claim.

Thus, Plaintiffs have demonstrated by a preponderance of the evidence that the damages that they suffered from Defendant's false representations are $99,548 paid in compensation to Defendant for unlicensed construction work, which must be returned to Plaintiffs pursuant to California Business & Professions Code § 7031(b), and the $78,000 lost equity for the value of the two houses which were demolished for the project.

Plaintiffs also request relief pursuant to California Civil Code section 7160, which provides that "Any person who is induced to contract for a work of improvement, including but not limited to a home improvement, in reliance on false or fraudulent representations or false statements knowingly made, may sue and recover from such

contractor or solicitor a penalty of five hundred dollars ($500), plus reasonable attorney's fees, in addition to any damages sustained by him by reason of such statements or representations made by the contractor or solicitor."

As damages claimed under California Civil Code section 7160, the court does not award to Plaintiffs in damages the penalty of $500 since the penalty is not compensatory for damages proximately caused by the tort injury, but a sanction imposed by the state for fraudulent inducement of unlicensed contractor work. Plaintiffs assert that they are entitled to reasonable attorneys' fees under this provision for the services of their attorneys for this litigation, but offered no evidence at trial in support of such award. [6] Plaintiffs may be entitled to such an award as prevailing parties on their claim of false representation in this adversary proceeding, and thus, the court reserves its ruling on such a claim, but requiring that any such claim be presented to the court in a motion in conformance with the requirements of Local Bankruptcy Rule 7054-1.

In their trial brief, Plaintiffs asserted a claim for punitive damages that "[t]he court should consider punitive damages for Ms. Fernandez'[s] reckless or callous disregard established by conduct that is malicious, wanton or oppressive," arguing that they "have lost their home" and "[w]hile the actual damages for that loss may be limited to the equity, that amount of damages cannot possibly give them what they lost." Plaintiffs' Trial Brief, Docket No. 35 at 7-8. In their trial brief, however, Plaintiffs did not cite any legal authority for their claim of punitive damages or refer to any evidence in support of such claim. *Id.* Moreover, Plaintiffs did not assert a claim for punitive damages in their proposed findings of fact and conclusions of law and have not otherwise cited to any legal authority or evidence in support of such claim. Plaintiffs' Proposed Findings of

---

[6] According to Mrs. Cruz, Plaintiffs were assisted by Public Counsel, a public interest law organization, in filing the complaint, and Public Counsel referred them to their present counsel, Resnik Hayes Moradi LLP, which firm agreed to take the case on from there. Cruz Trial Declaration, ¶ 47. Also, Mrs. Cruz stated in her trial declaration that Plaintiffs incurred attorneys' fees of more than $7,000 in the stayed state court lawsuit against Defendant for breach of contract and return of compensation. Cruz Trial Declaration, ¶ 46. However, there is no evidence in the record about fee arrangements for the services performed by Plaintiffs' counsel either in this bankruptcy case or the stayed state court lawsuit.

Fact and Conclusions of Law, Docket No. 86 at 8-9. Defendant opposes an award of

punitive damages against her, arguing that "no punitive damages should be allowed since

there was no showing or establishment of malice" and "[p]unitive damages must be

proven by clear and convincing evidence." Defendant's Proposed Findings of Fact and

Conclusions of Law, Docket No. 90 at 20. Likewise, Defendant did not cite to any legal

authority or evidence in opposition to Plaintiffs' claim for punitive damages. *Id.*

Nevertheless, the court thus finds that Plaintiffs' claim for punitive damages is either

abandoned or unsubstantiated and does not award any damages on such claim. In any

event, the court does not view this case as warranting punitive damages because despite

Defendant's fraud in making false representations to Plaintiffs about her license status

and her experience, she did put the money that Plaintiffs gave her for the project into the

project and made sincere efforts in trying to complete the project as the parties had

agreed.

Based on the foregoing, Plaintiffs have otherwise established a prima facie case on

their claim that Defendant owes a debt to them based on the tort of fraud under California

law which is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). [7]

In her proposed findings of fact and conclusions of law, Defendant asserts an

affirmative defense of waiver as follows:

Defendant would like to assert [the] affirmative defense of waiver, if it is deemed

that Plaintiffs met each and every elements of fraud cause of action.

Waiver is the intentional relinquishment of a known right after knowledge of facts.

*Roesche v. De Mota,* 24 Cal.2d 563 (1944). When a party claiming to have been

defrauded, enters, after discovery of the fraud, into new arrangements or engagements

concerning the subject-matter of the contract to which the fraud applies, he is deemed to

---

[7] As previously noted, the elements of a claim under 11 U.S.C. § 523(a)(2)(A) and the tort of fraud under California law are essentially the same. Compare *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d at 1222; *In re Slyman*, 234 F.3d 1081; *Grogan v. Garner*, 498 U.S. at 291 with *Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th at 973-981; *Liodas v. Sahadi,* 19 Cal.3d at 287-293.

have waived any claim for damages because of the fraud.  *Scheid v. Bodinson Mfg. Co.,*
79 Cal.App.2d 134 (1947).

Here, Mrs. Cruz initially transferred that she learned of the fact that Defendant is
not an independent contractor, that the house was demolished, and the new permit was
required by the end of February 2016.  Then Mrs. Cruz testified that she learned of these
facts in May 2016.  Either way, claiming to have been defrauded, Mrs. Cruz agreed to
have Defendant continue working on the project with new arrangement, which was not to
make further payments until Defendant gets necessary plans and permitted approved and
to complete the concrete foundation.  Mrs. Cruz also had Defendant handle rental
housing documents and master covenant documents on her behalf, which were not within
the agreed scope of work entered on or about December 29, 2015.  Defendant's Proposed
Findings of Fact and Conclusions of Law, Docket No. 90, filed on February 12, 2021, at
15.

The court rejects Defendant's affirmative defense of waiver as procedurally
improper as she was required by Federal Rule of Civil Procedure 8(c)(1), made
applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7008,
to affirmatively state any avoidance or affirmative defense, including waiver, in her
pleading in response to Plaintiffs' complaint, and she did not affirmatively state waiver as
an affirmative defense in her response to the complaint.  Response to Complaint for Non-
Dischargeability of Debt under [11 U.S.C.] Section 523(a)[(1)](A), Docket No. 7.  The
court also notes that the parties did not list the issue of waiver as an issue of law to be
litigated at trial in their amended joint pretrial stipulation filed on December 2, 2019,
Docket No. 34 at 5 (the parties agreed in the amended joint pretrial stipulation that "The
Following Issues of Law, and No Others, Remain to be Litigated," including six specific
issues of law, but not waiver).

The court further rejects Defendant's affirmative defense of waiver on the merits
because there was no "new arrangement" between Plaintiffs and Defendant after they

discovered the fraud when they learned that Defendant was not licensed as she previously

represented to them, they just agreed to go along with the existing contract to build the

addition, that is, they merely affirmed the existing contract by continued performance.

As explained by Miller and Starr, *California Real Estate*:

> Once the fraud is discovered, the injured party cannot further rely on the
> fraudulent representation or failure to disclose. He or she does not waive the right
> to recover damages by electing to forego rescission and to affirm the contract by
> continued performance according to its terms. Thus, the party who proceeds with
> the transaction after discovering the fraud has waived the remedy of rescission, but
> not the remedy of damages for the fraud. The right to recover damages may be
> waived by making a new agreement with the fraudulent party, but in order to
> constitute a waiver, the defrauded party must receive some material concession or
> new consideration by the new arrangement.

1 Miller and Starr, *California Real Estate*, § 1:171, *citing inter alia, Bagdasarian v.

Gragnon,* 31 Cal.2d 744, 750 (1948) and *Schied v. Bodinson Mfg. Co.,* 79 Cal.App.2d at

142.

When Plaintiffs learned of the fraud that Defendant had misrepresented her license

status, they agreed to continue performing on the contract. The parties did not make a

new contract. There was no "new arrangement" as there were no new material

concessions or consideration made to them by Defendant. In any event, there could no

valid new agreement because the premise of any such new agreement was for Defendant

to provide contractor services to Plaintiffs which would have been void and illegal

because Defendant is unlicensed. *Lewis & Queen v. N.M. Ball Sons,* 48 Cal.2d 141, 149-

151 (1957).

///

///

///

Based on the foregoing findings of fact and conclusions of law, the court determines that Plaintiffs are entitled to judgment on their complaint filed in this adversary proceeding and orders that Plaintiffs submit a proposed form of judgment within 30 days of the date of entry of these findings of fact and conclusions of law.

IT IS SO ORDERED.

###

Date: July 7, 2021

_____
Robert Kwan
United States Bankruptcy Judge